IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 24, 2019 Session

## BENDALE ROMERO v. STATE OF TENNESSEE

Appeal from the Criminal Court for Knox County
No. 109928    Steven W. Sword, Judge

No. E2018-00404-CCA-R3-PC

The petitioner, Bendale Romero, appeals the denial of his petition for post-conviction relief, which petition challenged his 2014 convictions of attempted first degree murder, employing a firearm during the commission of a dangerous felony, and aggravated assault on grounds that he was deprived of the effective assistance of counsel. Because the indictment was constitutionally deficient as to the charge of employing a firearm during the commission of a dangerous felony, we vacate that conviction but otherwise affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed in Part; and Vacated and Dismissed in Part.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Sherif Guindi, Knoxville, Tennessee, for the appellant, Bendale Romero.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arose from an incident in 2013 in which the petitioner, along with a co-defendant, shot the victim, Nathan Kelso. *State v. Bendale Romero*, No. E2015-00860-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Knoxville, June 15, 2016). This court summarized the evidence at trial as follows:

On August 10, 2013, Nathan Kelso drove to Lonsdale Homes in Knoxville for the purpose of exchanging marijuana

for crack cocaine. When he arrived at Lonsdale Homes, he saw "the boy Josh," later identified as Joshua Johnson, pointing a gun at two unidentified individuals. Mr. Kelso waited for their confrontation to conclude, and after it had, he approached Mr. Johnson and said, "I don't know what's going on with you and those guys or whatever, but I need something to, you know, to trade off." Mr. Johnson then turned to Mr. Kelso, said, "[F]— that," and shot him in the leg "for no reason." Mr. Kelso asked, "[W]hat the f— is wrong with you[?]" and held up his arm in a defensive posture. Mr. Johnson then shot Mr. Kelso in the arm, and Mr. Kelso fell to the ground. At that point, Mr. Kelso realized there was a second person with Mr. Johnson, later identified as the Defendant. After Mr. Kelso fell to the ground, he heard Mr. Johnson encourage the Defendant to shoot Mr. Kelso in the head. The Defendant pointed the gun at Mr. Kelso's forehead and pulled the trigger, but the gun did not fire. The Defendant then pushed Mr. Kelso back to the ground, fixed the gun, and shot Mr. Kelso in the head. That bullet also passed through Mr. Kelso's hand. Mr. Kelso reported that Mr. Johnson left in a Camaro driven by the Defendant.

*Id.* The jury convicted the petitioner of attempted first degree murder, attempted first degree murder with serious bodily injury, employing a firearm during the commission of attempted first degree murder, aggravated assault with serious bodily injury, and aggravated assault with a deadly weapon. *Id.* The attempted first degree murder convictions merged into a single charge as did the aggravated assault convictions. *Id.* The trial court sentenced the petitioner to an effective sentence of 26 years' incarceration. The sentence for the attempted murder conviction is 20 years with an 85 percent release eligibility. *Id.* On direct appeal, this court affirmed the petitioner's convictions. *Id.*, slip op. at 11.

The petitioner filed a timely pro se petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition for post-conviction relief followed by a second amended petition, alleging the ineffective assistance of the petitioner's trial counsel. Specifically, the petitioner alleged that trial counsel failed to apprise the petitioner of all of the charges against him, failed to call certain witnesses at trial, failed to fully investigate in preparation for trial, failed to impeach the victim with certain prior statements, and failed to object to instances of prosecutorial misconduct.

-2-

At the November 16, 2017 evidentiary hearing, the petitioner testified that the State had extended to him a plea offer that provided for a 16-year effective sentence to be served at 85 percent release eligibility percentage, but he rejected that offer and went to trial instead. He stated that he was not fully aware of the charges against him when he rejected the plea offer; specifically, he contended that he did not know that he was charged with employing a firearm during the commission of a dangerous felony because trial counsel never discussed that charge with him. The petitioner read the following from the indictment[1] charging him and his co-defendant, Joshua Johnson: "Attempted first-degree murder, comma, employing a firearm during a dangerous felony, in parenthesis, Johnson only; unlawful possession of a weapon, in parenthesis, Johnson only; and aggravated assault." The petitioner testified that trial counsel did not object to the trial court's reciting the charges of employing a firearm during the commission of a dangerous felony and unlawful possession of a weapon as being against Mr. Johnson only. The petitioner stated that trial counsel informed him at trial that the plea offer was still available but advised him that it was not in his best interests to accept the offer. He asserted that he again rejected the offer because he was still unaware of the firearm charge against him. The petitioner testified that he first became aware that he was facing the firearm charge when, after the close of evidence and during discussion of the jury instructions, the State informed the court that the firearm charge applied to the petitioner as well as to his co-defendant. The petitioner contended that, had he known that he was facing the charge of employing a firearm during the commission of a dangerous felony in addition to the attempted first degree murder and aggravated assault charges, he would have accepted the plea offer.

The petitioner testified that Tomekian Pennington and Teresa Bowman were prepared to testify in his defense at trial, but trial counsel never called them as witnesses. The petitioner acknowledged that Mr. Pennington's testimony was proffered on the record but never presented to the jury. The petitioner told trial counsel that the victim's cousin, Anthony Kelso,[2] said that the victim admitted that he was trying to rob the petitioner when he was shot, but trial counsel did not call Anthony Kelso as a witness. The petitioner recalled that, during closing argument, the prosecutor "was on her knees in front of the jury" and said "[y]ou know [the victim was] thinking about his four kids" during the shooting.

---

[1]  The indictment was not exhibited to the evidentiary hearing and the record before us does not contain the technical record of the trial proceedings; however, we take judicial notice of the trial technical record in this case. *See Delbridge v. State*, 742 S.W.2d 266, 267 (Tenn. 1987) ("The courts may take judicial notice of the court records in an earlier proceeding of the same case and the actions of the courts thereon." (citing *State ex rel. Wilkerson v. Bomar*, 376 S.W.2d 451 (1964))).

[2]  Because the victim has the same last name, we will refer to Anthony Kelso by his full name.

During cross-examination, the petitioner testified that trial counsel reviewed discovery materials with him and discussed a plea offer that he would extend to the State. The petitioner recalled telling trial counsel "that if he could give me something at 30 I will plea out." Trial counsel told him that the State had counter-offered 16 years at 85 percent, which offer the petitioner rejected. The petitioner stated that trial counsel showed him the indictment but "never explained it in depth."

Teresa Bowman, the petitioner's grandmother, testified that she lived in and grew up in the Lonsdale area of Knoxville and that she had known the victim since he was about nine or 10 years old. When describing the victim's reputation in the community, Ms. Bowman stated, "At first he was a good person. . . . Then he got hooked on those drugs, and his life did a 360 turn into stealing and robbing and bullying people just to get a fix, just to get high. He didn't care who he hurt. . . ." She also said that the victim had been known to be violent; he carried a gun and "would beat [people] up and . . . bully them." She continued, "[P]eople feared him out there, because he was big and he would take what he want[ed]. . . . He was a bully." Ms. Bowman had known the victim to be that way for 12 or 13 years.

On cross-examination, Ms. Bowman testified that she was aware of the petitioner's prior assault charge arising from a fight at school. She was not aware of other instances of the petitioner's criminal conduct. She believed that the petitioner's juvenile probation resulted from his "fighting." She also stated that she believed that the petitioner had smoked marijuana. Ms. Bowman was present at the courthouse during the petitioner's trial, and trial counsel told her that she would be called as a witness.

On direct-examination by the petitioner, trial counsel testified that, as part of the discovery materials in this case, he received recordings of the victim's interviews with a police officer and recalled "the aggressiveness" with which the victim talked about the petitioner and his co-defendant on the recordings. Trial counsel stated that he could not remember why he did not cross-examine the victim about those statements. Trial counsel recalled that, during trial, he argued that a prejudicial statement from a recording of a 9-1-1 call should be redacted if the call would be played for the jury. Trial counsel inferred that the 9-1-1 caller was the State's witness Michael Tillery and objected to the statement because the 9-1-1 caller identified the shooter as the same person who had previously "kicked him in the head." The State responded that the statement was that the shooter had previously "shot him in the eye." The trial court ruled that the statement was not admissible and must be redacted from the recording.

-4-

Trial counsel stated that he proffered the testimony of Mr. Pennington, expecting Mr. Pennington to testify about an incident in which the victim "tried to bully" the defendant on a prior occasion. Trial counsel believed, however, that if Mr. Pennington were to testify about the victim's being the first aggressor, the State would call Mr. Tillery to testify that the petitioner had previously shot him in the eye. Mr. Tillery had already appeared as a witness for the State, and, during Mr. Pennington's proffered testimony, trial counsel overheard the prosecutor instruct someone to bring Mr. Tillery back to the courtroom. Trial counsel testified that "it would be a better idea for us to leave . . . Mr. Pennington out rather than risk . . . open[ing] the door to a prior aggressive act by [the petitioner]." Trial counsel denied believing that the trial court would permit the redacted statement from the 9-1-1 recording to be admitted as rebuttal evidence; rather, he believed that the State would offer the testimony of Mr. Tillery to rebut Mr. Pennington's testimony of the victim's being the first aggressor. Trial counsel contended that he did not argue that he believed the redacted statement from the 9-1-1 call would be admissible as rebuttal to Mr. Pennington's testimony on direct appeal.

Trial counsel recalled that, while cross-examining the petitioner at trial, the State asked about the petitioner's juvenile record and the fact that he was on juvenile probation. Counsel acknowledged that he did not object to that line of questioning at trial and explained that, if he did not raise the issue on direct appeal, it was because "after reviewing the whole thing" he "must have not . . . [thought] it was that strong of an argument." Trial counsel could not recall why he did not object to the prosecutor's statement that "[w]e believe [Mr. Tillery and Henry Wilson] to be credible" but stated: "[I]t was a who-believed-who trial. So I mean, . . . I was more concerned about the proof and the argument at the time. . . . I don't recall thinking in my mind that I should object to her credibility stuff."

On cross-examination by the State, trial counsel described his defense strategy as "building a case against [the victim]" because "[i]t was [the petitioner's] version of what happened against [the victim's]." Trial counsel testified that he discussed all of the charges, including the firearm charge, with the petitioner and that he reviewed the indictment with the petitioner. They discussed a plea agreement pursuant to which the petitioner would plead guilty to attempted second degree murder with a sentence of 12 years to be served at 30 percent, and the State would drop the firearm charge. Trial counsel testified that he proposed this plea agreement to the State in a letter, and the State responded with a counteroffer that required the petitioner to plead guilty to attempted first degree murder in exchange for a sentence of 16 years to be served at 85 percent, and the State would drop the firearm charge. Trial counsel testified that he relayed the counteroffer to the petitioner, but the petitioner did not want to accept it. Trial counsel explained to the petitioner that he was facing a total of 21 to 31 years' incarceration, but

the petitioner "didn't want to have anything to do with an 85 percent sentence." Trial counsel stated that it was the petitioner's decision to reject the plea offer.

During redirect examination, trial counsel stated that he could not recall whether he gave the petitioner a copy of the indictment, but he "went over what he was charged with in the indictment." Trial counsel admitted that he had noticed the words "Johnson only" following the firearm charges on the indictment, and he discussed the issue with the State and "did some research," but he did not move for the indictment to be dismissed. Trial counsel averred that he "made it clear throughout . . . conversations" with the petitioner that the petitioner was charged with the firearm charge, stating "That was very much a part of our plea negotiations."

The post-conviction court took the matter under advisement and issued an order denying post-conviction relief on February 7, 2018. In its written order, the post-conviction court found that "[t]he proof at the post-conviction hearing indicated that the petitioner was well aware that he was also facing an employing a firearm charge." The post-conviction court also found that trial counsel's decision to not call Mr. Pennington and Ms. Bowman as witnesses was "informed and reasonable" because of his concern that their testimony would open the door for the State to present evidence of the petitioner's prior acts of violence. As to trial counsel's failure to subpoena Anthony Kelso as a witness, the post-conviction court found that, because Anthony Kelso did not testify at the post-conviction hearing, the petitioner was not entitled to post-conviction relief on that issue. The post-conviction court also found that, although the victim's statements to police indicated that he would have physically assaulted the petitioner, the statements, on their face, "indicate[d] the defendants were the first aggressors, not the victim," which would not have been helpful to the defense.

The post-conviction court further found that trial counsel performed deficiently by failing to object to the prosecutor's saying during closing argument that "the victim would have been thinking about his kids" during the shooting because the statement "was not supported by the proof and was a direct appeal for emotional sympathy." The court concluded, however, that the petitioner was not prejudiced by this deficient performance because "[t]here was proof that the victim had kids and was begging for his life"; therefore, the prosecutor's inappropriate statement did not "significantly increase the degree of empathy a juror would have had for the victim." The post-conviction court noted that, had trial counsel objected, the court "would have given corrective instruction." The post-conviction court found that the prosecutor's saying "[w]e believe them to be credible" was "an improperly worded expression of personal belief" that "was clearly made in the context of arguing about the proof as to why the jury should believe the victim." The post-conviction court found that trial

counsel's performance was not deficient for failing to object to the State's line of questioning related to the petitioner's being on juvenile probation because the petitioner was the first person to raise the issue, and, had trial counsel objected, he would have drawn the jury's attention to it.

In this timely appeal, the petitioner argues that the post-conviction court erred by denying post-conviction relief, asserting that he was deprived of the effective assistance of counsel by trial counsel's failing to call certain witnesses at trial, failing to cross-examine the victim regarding certain statements, failing to object to the State's conduct or plead prosecutorial misconduct, and failing to inform the petitioner of the firearm charge. The State asserts that the post-conviction court did not err.

## I. Post-Conviction Relief

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

## II. Ineffective Assistance of Counsel

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to

relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Here, the petitioner has failed to carry his burden to prove by clear and convincing evidence sufficient facts to support his assertion that he was prejudiced by trial counsel's deficient representation.

### A. Failure to Call Certain Witnesses

The petitioner first argues that trial counsel performed deficiently by failing to call Mr. Pennington, Ms. Bowman, or Anthony Kelso as witnesses at trial. To support a claim of ineffective assistance of counsel premised on counsel's failure to call certain witnesses, "these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Black*, 794 S.W.2d at 757. A petitioner's failure, at the evidentiary hearing, to "produce a material witness who . . . would have testified favorably in support of his defense if called" precludes a finding of prejudice because "neither a trial judge nor an appellate court can speculate or guess . . . what a witness's testimony might have been if introduced by defense counsel." *Id.* at 757-58.

Here, the petitioner presented Ms. Bowman's testimony at the evidentiary hearing, and Mr. Pennington's testimony was proffered at trial. The post-conviction court found that trial counsel did not call Mr. Pennington to testify to the jury because he "was worried about opening the door to the direct testimony of Mr. Tillery concerning a

prior violent encounter with the petitioner." Similarly, the post-conviction court found that, had counsel called Ms. Bowman to testify at trial, "he would be opening the door to testimony concerning prior aggressive behavior and illegal weapons use by the petitioner." Because the record supports the conclusion that testimony from Mr. Pennington and Ms. Bowman would have permitted the State to offer evidence damaging to the petitioner, trial counsel's decision to forego their testimony was reasonable. Because Anthony Kelso did not testify at the evidentiary hearing, the petitioner has failed to prove that he was prejudiced by trial counsel's failure to call that witness at trial. *See Black*, 794 S.W.2d at 757-58.

## B. *Failure to Cross-Examine the Victim on Certain Statements*

Next, the petitioner argues that counsel performed deficiently by failing to cross-examine the victim about statements he made during his interviews with a police officer. Trial counsel recalled that the victim had made aggressive statements about the petitioner to a police officer, but could not recall why he did not question the victim on the statements. The post-conviction court found that "[t]he statements in question indicated that the victim would have physically assaulted the defendants" but that "the context of the statements did not show that he was a first aggressor or was considering being the first aggressor." The post-conviction court concluded that these statements by the victim did not support the petitioner's trial strategy of portraying the victim as the first aggressor. Even if the victim's statements comported with the petitioner's theory of defense, in light of the trial court's decision to permit the State to introduce evidence of the petitioner's prior aggressive conduct if the petitioner presented evidence of the victim as the first aggressor, trial counsel's decision not to question the victim on his statements qualifies as a reasonable strategic decision. *See Lawrence Warren Pierce v. State*, No. M2005-02565-CCA-R3-PC, slip op. at 8 (Tenn. Crim. App., Nashville, Jan. 23, 2007) ("Trial counsel's decision not to cross-examine a witness regarding an issue is a strategical or tactical choice, if informed and based on adequate preparation." (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982); *Lofton v. State*, 898 S.W.2d 246, 249 (Tenn. Crim. App. 1994))).

## C. *Failure to Object to Prosecutorial Misconduct*

Next, the petitioner asserts that trial counsel performed deficiently by failing to object to certain instances of prosecutorial misconduct. The petitioner specifies four instances of prosecutorial misconduct to which, he contends, trial counsel should have objected. First, the petitioner argues that the prosecutor engaged in misconduct when she "failed to correct the [c]ourt when it clearly misstated that the [petitioner] was

not charged with employing a firearm during the commission of a dangerous felony." However, the post-conviction court found that the petitioner was well-aware of all of the charges against him, and trial counsel's accredited testimony established that the charge of employing a firearm during the commission of a dangerous felony was a material part of the plea negotiations. Therefore, the petitioner cannot show that he was prejudiced by trial counsel's lack of objection.

Second, the petitioner contends that trial counsel should have objected to the prosecutor's stating that the victim was thinking about his children during the shooting. The post-conviction court found that "the victim testified that he had children" but "never said he was thinking about his kids at any point" and that the prosecutor's statement "was a direct appeal for emotional sympathy." The court noted that, had trial counsel objected to the prosecutor's statement, "the court would have given a corrective instruction." We agree with the post-conviction court that trial counsel performed deficiently by failing to object to the prosecutor's statement because the remark was inappropriate. *See State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. 2003) (stating that "[i]t is unprofessional conduct for the prosecutor intentionally to misstate the evidence" or "to intentionally refer to or argue facts outside the record" and that "[t]he prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury"). Although the prosecutor's statement went beyond the evidence adduced at trial, the petitioner has failed to show how he was prejudiced by trial counsel's failure to object to the statement. The post-conviction court found that "[t]here was proof that the victim had kids and was begging for his life," and that, therefore, the prosecutor's inappropriate statement "had little, if any, impact" on the outcome of the trial. We agree that, even if trial counsel had objected to the prosecutor's statement, it is unlikely that the petitioner would have achieved a different outcome at trial.

Next, the petitioner argues that, during both her opening statement and closing argument, the prosecutor stated "that two 911 callers heard the alleged victim['s] begging for his life" but that the evidence did not support that assertion. Because the petitioner did not present any evidence on this claim at the evidentiary hearing, he has failed to show how he was prejudiced by trial counsel's failure to object to this statement.

Finally, the petitioner argues that the prosecutor improperly vouched for the credibility of certain State witnesses during closing argument, when she made the following statements:

> You've gotta make a credibility call. . . . You know, Mr.
> Wilson and Mr. Tillery, they have no dog in this fight, they

have no reason to make up that part of their testimony, none
at all. We believe them to be credible.

The other thing -- I want you to think about what [the
petitioner] told you . . . . [E]ven though he's got a cell phone,
he doesn't take it with him. He's 18. We believe that -- that
screams credibility.

Although the post-conviction court found that the prosecutor's statements
did not amount to vouching, the statements are clearly improper. *See* Tenn. Sup. Ct. R. 8,
§ 3.4(e)(3) ("A lawyer shall not . . . in trial . . . state a personal opinion as to the . . . the
credibility of a witness[.]"); *State v. Henley*, 774 S.W.2d 908, 911 (Tenn. 1989) ("A
lawyer should not assert his [or her] personal opinion as to the credibility of a witness . . .
."); *State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999) (same). As our
supreme court has said, "It is unprofessional conduct for a prosecutor in his [or her]
argument to the jury to express his or her personal belief or opinion as to the truth or
falsity of any testimony or evidence" and "any intentional effort to influence the
members of a jury by expressions of personal opinion cannot be condoned." *Henley*, 774
S.W.2d at 911.

Despite the prosecutor's inappropriate remarks, the record establishes that
the petitioner was not prejudiced by trial counsel's failure to object. The witnesses for
whom the prosecutor vouched did not actually connect the petitioner to the crime. At
trial, the victim testified that the petitioner shot him in the head, and the petitioner
admitted to shooting the victim but argued that he did so in self-defense. *Bendale
Romero*, slip op. at 2-3. Because the victim's testimony and the petitioner's own
admission established that the petitioner shot the victim, trial counsel's failure to object to
the prosecutor's vouching for the testimony of two witnesses who said that they heard
gunshots, saw a car drive away from the scene, and saw the victim suffering from
gunshot wounds did not prejudice the petitioner.

### D. Failure to Inform the Petitioner of All Charges

Finally, the petitioner asserts that counsel performed deficiently by failing
to fully inform him of all charges against him, which prevented him from making an
informed decision regarding the State's plea offer. Specifically, the petitioner contends
that he was not aware that he was charged with employing a firearm during the
commission of a dangerous felony. The petitioner points to a discrepancy in the
indictment as evidence that he was not aware of all the charges against him; however,
trial counsel's accredited testimony established that he fully informed the petitioner of all

of the charges including the firearm charge. Therefore, counsel's performance was not deficient in this regard. An indictment that fails to put a defendant on notice of the charges against him, however, is constitutionally defective and any conviction under such an indictment cannot stand. *See State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997).

The petitioner did not challenge the sufficiency of the indictment in the trial court and does not raise the matter here apart from the ineffective assistance of counsel claim. Despite the petitioner's failure to raise the issue, he has not waived our review of the matter because "mandatory authority provides that a defendant cannot waive objections to a lack of subject matter jurisdiction or the failure of an indictment to charge an offense." *Sharrad Sharp*, No. W2018-00156-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Jackson, Feb. 26, 2019); *see also Dykes v. Compton*, 978 S.W.2d 528, 529 (Tenn. 1998) ("A valid indictment is an essential jurisdictional element, without which there can be no prosecution."). Furthermore, a challenge to the constitutional sufficiency of an indictment may be addressed in a post-conviction proceeding. *Sharrad Sharp*, slip op. at 8 (stating that a defendant may challenge an indictment's failure to charge an offense "for the first time in a petition for post-conviction relief") (citing *John Smith v. State*, No. W2015-00633-CCA-R3-PC, slip op. at 10 (Tenn. Crim. App., Jackson, May 27, 2016)).

The confusion regarding the charges applicable to the petitioner can be attributed solely to the sloppy drafting of the indictment in this case. The cover sheet of the indictment indicated that the petitioner and co-defendant Johnson were charged with attempted first degree murder and aggravated assault. The cover sheet further indicated that only co-defendant Johnson was charged with employing a firearm during the commission of a dangerous felony and the unlawful possession of a weapon. The cover sheet provided no indication that the petitioner was charged with any firearm offense. Count three of the indictment, however, reads: "BENDALE ROMERO, ALIAS, AND JOSHUA JOHNSON, ALIAS, heretofore, to-wit . . . did unlawfully and knowingly employ a firearm during the commission of a dangerous felony[.]"

"Preparation of an indictment is the responsibility of the office of the district attorney general," and there is no excuse for a lack of attention to detail in this duty. *Sharrad Sharp*, slip op. at 14 (declaring void an indictment that listed one offense on the cover page but charged another within the body of the indictment); *see also Pearce v. State*, 33 Tenn. 63, 67 (1853) ("[T]he indictment must charge the crime with certainty and precision . . . ." (citation omitted)). In addition to our concern with regard to the poor drafting in this case, we are also concerned that the State made no attempt to correct the error prior to the defendant's trial. To further compound the error, the State failed to correct the trial court during the reading of the indictment at the joint trial of the petitioner and co-defendant when the trial court told the jury that the charge of employing

a firearm during the commission of a dangerous felony applied only to co-defendant Johnson. *See Sharrad Sharp*, slip op. at 14 (observing that "it is squarely the responsibility of the district attorneys general in this state to ensure that indictments are properly drafted").

The United States Constitution and the Tennessee Constitution "guarantee to the accused the right to be informed of the nature and cause of the accusation" against him. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997); *see also* U.S. Const. amend. VI; Tenn. Const, art. I, § 9. Our supreme court has held that an indictment is constitutionally valid if it "provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *Hill*, 954 S.W.2d at 727 (citations omitted); *Jermaine Gwin v. State*, No. W2014-00681-CCA-R3-HC, slip op. at 3 (Tenn. Crim. App., Jackson, Jan. 16, 2015); *see also U.S. v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (stating that the Constitution requires that an indictment "contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend, and . . . enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense" (quoting *Hamling v. U.S.*, 418 U.S. 87, 117 (1974)). An indictment that fails to provide notice to the defendant is invalid. *See Hill*, 954 S.W.2d at 727; *Sharrad Sharp*, slip op. at 11.

The Code further requires that "[t]he indictment must be certain as to the person charged," T.C.A. § 40-13-203; but errors in the defendant's name are not fatal to an indictment if the indictment otherwise provides sufficient notice, *see Mullins v. State*, 571 S.W.2d 852, 855 (Tenn. Crim. App. 1978) (concluding that an indictment provided "adequate notice" to the defendant despite its using an incorrect middle initial for the defendant in the caption and in one count but correctly identifying the defendant elsewhere because there was "no way in which the defendant could have been misled"). A clerical or other immaterial error does not invalidate an indictment "unless the meaning is obscured." *State v. Brown*, 50 Tenn. 1, 5 (1870) (quoting *State v. Wimberly*, 3 McCord, 190); *accord Jermaine Gwin*, slip op. at 3-4 (finding an indictment sufficient to provide notice despite the wording on the cover sheet failing to track the language of the statute because there was "no substantial difference" in the meaning and because the wording in the body of the indictment was sufficient); *Janow v. State*, 567 S.W.2d 483, 484 (Tenn. Crim. App. 1978) ("The erroneous statement of an incorrect term of court at the top of the indictment is immaterial and does not invalidate an indictment where the caption shows the term at which the indictment is preferred.") (citations omitted); W. Mark Ward, Tennessee Criminal Trial Practice § 12:9 (2018-2019 ed.). When an indictment contains an ambiguity or otherwise lacks necessary information, the indictment may be found valid if other parts of the indictment are incorporated to resolve

-13-

the issue. *See State v. Nixon*, 977 S.W.2d 119, 121-22 (Tenn. 1997) (finding that the omission of the defendants' names in the body of a single-count indictment was not fatal because the defendants' names appeared on the cover sheet); *Mullins*, 571 S.W.2d at 854 (recognizing that "our Supreme Court has held that in a multi-count indictment, references in one count may be used in aid of identification allegations made in another count") (citing *Chapple v. State*, 135 S.W. 321 (1910)). Although "a minor discrepancy between the language on the cover sheet and the language contained in a count of the indictment will not render the indictment void," *Sharrad Sharp*, slip op. at 11 (citing *Jermaine Gwin*, slip op. at 3-4), the cover sheet is relevant to the determination of whether the indictment provided the defendant sufficient notice of the charges, *see Sharrad Sharp*, slip op. at 11 ("[T]he offenses specified on the cover sheet may be considered in determining whether the indictment sufficiently notified the defendant of the specific charges he would have to defend." (citing *Joseph R. Wiggins v. State*, No. W2008-02630-CCA-R3-HC, 2009 WL 4586550, at *5 (Tenn. Crim. App., Jackson, Dec. 7, 2009))).

In *Jermaine Gwin*, this court found that an indictment's cover sheet listing the charged offense as "murder second degree" did not invalidate the indictment because "there [wa]s no substantial difference" with the statutory language of "second degree murder" and because the body of the indictment alleged the elements of second degree murder and provided a citation to the statute under which the defendant was charged. *Jermaine Gwin*, slip op. at 3-4. In *Sharrad Sharp*, the cover sheet listed a charge of aggravated child abuse when the corresponding count of the indictment actually charged Sharp with aggravated child neglect. *Sharrad Sharp*, slip op. at 10-14. This court found that those counts failed to provide Sharp with adequate notice of the charged offenses and vacated and dismissed Sharp's convictions on those counts. *Id.*

Here, the cover sheet of the indictment indicated that the petitioner was not charged with employing a firearm during the commission of a dangerous felony, which was inconsistent with count three in the body of the indictment. Trial counsel's accredited testimony established that he noticed the discrepancy between the cover sheet and the body of the indictment and discussed it with the prosecutor. Despite having been made aware of the problem with the indictment, the State did not seek to correct the error. The signature of the attorney general on an indictment "at a minimum, implicitly warrant[s] that the count correctly and adequately meets the liberal standards to provide notice of what criminal offense is alleged." *Sharrad Sharp*, slip op. at 14. Furthermore, "it is squarely the responsibility of the district attorneys general in this state to ensure that indictments are properly drafted." *Id.*

-14-

In addition to providing notice to the defendant, an indictment must also "furnish the court adequate basis for the entry of a proper judgment." *Hill*, 954 S.W.2d at 727 (citing *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991)). The indictment here fell short of that requirement because the trial court recited the firearm charge as applying only to co-defendant Johnson three times before the State clarified that the charge was also against the petitioner. In the presence of the jury, the trial court read the charges as "attempted first degree murder, employing a firearm during a dangerous felony, Mr. Johnson, unlawful possession of a weapon, again just to Mr. Johnson, and aggravated assault, both defendants." Later, in denying the defendants' joint motion for judgment of acquittal on the ground of insufficient evidence, the trial court again considered the firearm charge as being against Mr. Johnson only, stating "both defendants are charged with attempted first degree murder and aggravated assault" and "Mr. Johnson also has two additional charges. One is the . . . charge of employing a firearm during a dangerous felony." The court ruled on the sufficiency of the evidence as to the firearm charge for Mr. Johnson only, but the State did not seek to correct the court at that time. In fact, it was not until the close of all evidence and after the court misstated the charges a third time that the prosecutor finally corrected the trial court's reading of the charges. Given that even the trial court was clearly confused as to the distribution of charges, we cannot say that the indictment met this second constitutional requirement. *See Hill*, 954 S.W.2d at 727.

The responsibility to draft an indictment that satisfies the constitutional requirements lies with the State alone. *See Sharrad Sharp*, slip op. at 14. Here, the indictment contained a discrepancy that caused confusion on the part of trial counsel and the trial court. Even after being made aware of the issue, the State made no effort to correct its error. The discrepancy between the cover sheet and the body of the indictment caused the indictment to mislead the trial court and the petitioner; therefore, it was insufficient to meet the constitutional requirement of giving notice to the accused. *See Sharrad Sharp*, slip op. at 11-14; *cf. Nixon*, 977 S.W.2d at 122 (finding an indictment sufficient despite an error because "[t]he indictment in no way misled or misinformed the defendants of the charge against them"). Because the indictment was constitutionally deficient as to the petitioner on the charge of employing a firearm during the commission of a dangerous felony, that conviction is void and cannot stand. As pointed out above, a void count of an indictment is cognizable in a post-conviction proceeding.

*E. Cumulative Error*

Finally, the petitioner contends that the cumulative effect of trial counsel's errors prejudiced his defense. Instances of ineffective assistance of counsel are deemed to constitute a single rendering of ineffective assistance. *Thompson v. State*, 958 S.W.2d

156, 161 (Tenn. Crim. App. 1997) ("Ineffective assistance of counsel is generally 'a single ground for relief' under the post-conviction statute." (citing *Cone v. State*, 927 S.W.2d 579, 581-82 (Tenn. Crim. App. 1995))). As such, a petitioner may assert *via post-conviction law*, that an aggregation of instances of deficient performance establish the prejudice prong of *Strickland*. We fail to discern any such aggregation in the present case that would avail the petitioner of the relief he desires.

*Conclusion*

Accordingly, we vacate the petitioner's conviction for employing a firearm during the commission of a dangerous felony, but otherwise affirm the decision of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-16-